# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

JAMES W. TRIMBLE, II,

    **Plaintiff,**

    v.

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

    **Defendant.**

Civil Action 2:10-cv-876
Judge James L. Graham
Magistrate Judge E.A. Preston Deavers

## REPORT AND RECOMMENDATION

### I. INTRODUCTION

Plaintiff, James W. Trimble, II, brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for social security disability insurance benefits. This matter is before the United State Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 12), the Commissioner's Memorandum in Opposition (ECF No. 13), and the administrative record (ECF No. 9). For the reasons that follow, the undersigned **RECOMMENDS** that the Court **REVERSE** the Commissioner of Social Security's non-disability finding and **REMAND** this case to the Commissioner and the ALJ under Sentence Four of § 405(g).

## I. BACKGROUND

Plaintiff filed his current application for benefits on July 7, 2006, alleging that he has been disabled since April 20, 2006, at age 44.[1] Plaintiff alleges disability as a result of a herniated disc displacement and depression. (R. at 117.) Plaintiff's application was denied initially and upon reconsideration. Plaintiff sought a *de novo* hearing before an administrative law judge.

Administrative Law Judge Timothy G. Keller ("ALJ") held two hearings, the first in July 2009 and the second in November 2009. At the November 2009 hearing, Plaintiff, represented by counsel, appeared and testified. A vocational expert also appeared and testified. (R. at 24-54.) On January 15, 2010, the ALJ issued a decision finding that Plaintiff was not disabled. (R. at 8-19.) The ALJ's decision became final and appealable in July 2010, when the Appeals Council denied Plaintiff's request for review. (R. at 1-3.) Plaintiff then timely commenced the instant action.

## II. HEARING TESTIMONY

### A. Plaintiff's Testimony

At the November 18, 2009 administrative hearing, Plaintiff testified that he cannot work due to his depression and his chronic back pain. (R. at 31, 33.) He testified that he signs "no harm contracts" with Dr. Mancuso because he suffers from thoughts of suicide. (R. at 29.) His wife locks up his medications after he received them. (*Id*.) He stated that his medications, for

---

[1] Plaintiff previously filed applications for disability insurance benefits and supplemental security income which were denied in a decision dated January 17, 2006. ( R. at 55-62,114.)

the most part, keep him "grounded." (R. at 30.) He represented that his depression is "so bad" that he "can't seem to leave [his] house." (R. at 31.) He explained that he has isolated himself at home for the past year-and-a-half. (R. at 27.) He represented that he feels safe in his house and only leaves to attend doctors appointments or to go to the corner store. (*Id.*) He indicated that he does still drive, but only "very short distances." (R. at 28.) He denied ever going on vacation or that he had left the state during that year. (*Id.*) When the ALJ subsequently confronted Plaintiff with record evidence indicating that Plaintiff had been to Las Vegas, Plaintiff admitted that he had gone to Las Vegas on vacation because his wife had treated him. (R. at 28-29.) He indicated, though, that the Las Vegas vacation had occurred in the previous year. (R. at 31.) When the ALJ confronted Plaintiff with evidence showing that the trip occurred just months before the hearing, in June 2009, and that the evidence revealed that Plaintiff and his wife went to the circus, rented a car, took a bus down the strip, and attended shows and dinner, Plaintiff admitted that the trip was that year, but represented that he "didn't have a great time." (R. a 31-33.)

With regard to his physical limitations, Plaintiff testified that his back pain was "so bad" that he could only walk and stand for ten-to- fifteen minutes at a time and then needed to lie down. (R. at 33-34.) He added that he did not think any job would allow him to lay down, which was his most comfortable position. (R. at 33.) He testified that even though he is a "big guy," he could only lift five pounds, and he could not do it repetitively. (R. at 34.) Although Plaintiff's doctors wanted to do a second back surgery, Plaintiff declined. (R. at 30.) His last treatment for back pain had been some epidurals a year ago. (*Id.*)

Plaintiff also added that he had trouble with his memory and speculated that maybe it was attributable to his medications. (R. at 34.) By way of example, Plaintiff noted that he had trouble remembering his Las Vegas vacation. (*Id*.)

**B.     The Vocational Expert's Testimony**

The ALJ asked the vocational expert, Lynn Kaufman ("VE"), to consider a person who was able to lift/carry/push/pull ten pounds occasionally and sit/stand/walk for six hours each in an eight-hour day. The individual was able to occasionally climb ramps and stairs and but never climb ladders, ramps or scaffolds. He was able to stoop occasionally. In addition, the individual retained the ability to understand, remember and carry out simple tasks and instructions, maintain concentration and attention for two hour segments over an eight-hour work period. He also was able to respond to supervisors and co-workers in a task oriented setting where contact with others was casual and infrequent. (R. at 39-40.) The VE testified that such a person could perform Plaintiff's past work as a paint inspector as he had performed it. (R. at 40.)

When Plaintiff's counsel cross-examined the VE, she testified that if the individual needed a sit/stand option, he would not be able to perform his past work. (R. at 41.) She indicated that the sit/stand option Plaintiff's counsel proposed reduced Plaintiff down to a sedentary-strength level, such that he could perform 20% of the unskilled, sedentary jobs. (*Id*.) The VE further indicated that if Plaintiff missed four days of work per month, it would be a problem. (R. at 41-42.) Finally, the VE testified that a cane is normally not precluded in the workplace, but if he had a sit/stand option, it could be a problem for some of the sedentary jobs. (R. at 42.)

## III. MEDICAL RECORDS

The record contains treatment notes from family practice physician, Steven Altic, D.O., dated from 2002 through March 2009. (R. at 196-218, 328-34, 489-94, 588-606.) Dr. Altic treated Plaintiff for back pain, including treatment with pain medications, trigger point injections, and physical therapy. (R. at 191.)

An MRI taken of Plaintiff's lumbar spine on May 19, 2003, showed moderate degenerative disc disease at L5-S1, moderate posterior osteophyte formations, and bulging disc along with facet joint hypertrophy contributing to the neuroforaminal stenosis bilaterally. (R. at 266.) An EMG in October 2006 was positive for low back radiculopathy. (R. at 409.)

Plaintiff began seeing pain management specialist Dr. Lingam in May 2004. (R. at 262-63.) Plaintiff reported injuring his low back and left lower extremity in a 1993 industrial accident and undergoing a micro-diskectomy. (R. at 262.) His current complaints included increased back and leg symptoms. (R. at 264.) Dr. Lingam's examination revealed limited spinal range of motion and an antalgic gait, but full leg strength. (R. at 263.) He recommended back injections and continued aquatherapy and gave Plaintiff medication. (R. at 263.) Dr. Lingam provided spinal injections through March 2007. (R. at 222-27, 244, 246-48, 250-53, 256-61, 355-56.)

Plaintiff reported to physical therapy in January and February 2006. During this time, he rated his back pain at four to seven out of ten in intensity. (R. at 215-17.)

Plaintiff started attending therapy sessions with psychologist April Mancuso, Psy. D. in April 2006. (R. at 584.) In June 2006, Dr. Mancuso indicated that Plaintiff had decreased

concentration and memory, angered easily, and had low stress tolerance due to his depression. (R. at 268-70.)

Consulting psychiatrist Alan G. Resor, M.D. saw Plaintiff on April 24, 2006. Plaintiff reported that he was injured on June 30, 1990, when a disc ruptured in his back. He noted that Plaintiff continued to work until April 20, 2003. According to Plaintiff, after his injury, he gradually developed significant depression. He indicated that he has been experiencing many depressive symptoms and that he had never suffered from depression before his injury. Plaintiff also indicated that he had no other medical problems and that he does not take any pain medication. Dr. Resor reported that Plaintiff's mental status during this appointment was dominated by depressive symptoms. Plaintiff noted that he had suicidal thoughts, but has never made an attempt. He also noted that he cries occasionally and feels very blue and pessimistic. He has not had panic attacks. Dr. Resor diagnosed Plaintiff with major depression secondary to the injury of June 30, 1990. Dr. Resor started Plaintiff on Cymbalta and recommended that he continue psychotherapy. (R. at 277.) Plaintiff saw Dr. Resor a total of three times through July 2008. (R. at 275-77.) Dr. Resor diagnosed major depression and prescribed medication, which Plaintiff reported was helpful. *Id.*

Examining physician Maureen C. Gallagher, D.O., M.P.H. reported in August 2006 that Plaintiff's spinal x-rays revealed severe disc change at L5-S1. (R. at 311.) Examination was normal except for low back range of motion limitations and tenderness. (R. at 310, 312-15.) Dr. Gallagher diagnosed Plaintiff with recurrent L5-S1 disc disease secondary to two Bureau of Workers' Compensation ("BWC") injuries, hyper extension injury of the right elbow, depression, and chronic back pain. She reported that Plaintiff exhibited "mild pain behavior."

6

(R. at 310.) Dr. Gallagher opined that Plaintiff should not "be placed in positions of unrelieved sitting, standing or walking"; could lift twenty pounds; and could not bend or lift frequently. (R. at 310.)

George Schultz, Ph.D. examined Plaintiff on behalf of the state agency on September 6, 2006. Dr. Schulz diagnosed him with dysthymia and assigned him a Global Assessment of Functioning (GAF) score of 55.[2] (R. at 279-86.) Dr. Schulz opined that Plaintiff had minimal impairment in his ability to relate to others and in his ability to maintain attention and concentration to perform tasks with adequate pace and perseverance; minimal to moderate impairment in his ability to understand, remember and follow instructions; and moderate impairment in his ability to withstand the stress of daily work. (R. at 284-85.)

In September 2006, state agency reviewing psychologist Douglas Pawlarczyk, Ph.D. opined that Plaintiff had mild limitations in his activities of daily living and his social functioning, as well as moderate limitations in his ability to maintain concentration, persistence, or pace. (R. at 292-302.) He concluded that Plaintiff could perform tasks without strict production quotas. (R. at 290.)

After reviewing the record in September 2006, state agency physician Dr. McCloud opined that Plaintiff could lift twenty pounds occasionally and ten pounds frequently; sit and

---

[2]The GAF scale is used to report a clinician's judgment of an individual's overall level of functioning. Clinicians select a specific GAF score within the ten-point range by evaluating whether the individual is functioning at the higher or lower end of the range. A GAF score of 55 is indicative of moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers) *See* American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 33–34 (American Psychiatric Association, 4th ed. text rev. 2000) (DSM-IV-TR).

stand/walk for about six hours each out of an eight-hour day; occasionally stoop and climb ramps and stairs; and never climb ladders, ropes or scaffolds. (R. at 317-23.)

On October 19, 2006, Dr. Mancuso opined that Plaintiff had made progress and was no longer severely depressed or expressing suicidal thoughts. (R. at 584.) She reported that Plaintiff's "anger towards the world" was slowing decreasing and he was working on his frustration tolerance. (*Id.*) In February 2007, Dr. Mancuso opined that Plaintiff had low frustration tolerance; low motivation; was easy to anger; and had "low average intellect." (R. at 344-46.) In May 2007, Dr. Mancuso noted that his mood and ability to sleep were slowly improving and that she anticipated reducing the frequency of Plaintiff's visits for therapy in a few months. (R. at 583.)

In May 2007, state agency reviewing psychologist, Mel Zwissler, Ph.D. opined that Plaintiff had moderate limitations in his activities of daily living; his social functioning; and his ability to maintain concentration, persistence or pace. (R. at 425-35.) Dr. Zwissler concluded that Plaintiff could do simple, repetitive work tasks in a stable environment with limited social contact. (R. at 441.)

In June 2007, state agency reviewing physician, James Gahman, M.D. opined that Plaintiff could lift twenty pounds occasionally and ten pounds frequently; sit and stand/walk for six hours each out of an eight-hour day; and occasionally stoop and climb ramps and stairs. (R. at 445-51.)

On October 30, 2007, Dr. Mancuso reported that Plaintiff's mood was improving after his nerve block and that his activity level had consequently increased. She indicated, though, that the positive effects did not last, and Plaintiff was, as a result, more frustrated and delusional.

8

(R. at 581.) On November 29, 2007, Dr. Mancuso noted that although Plaintiff has made progress, he was still clinically depressed. According to Dr. Mancuso, he would be unable to sustain gainful employment. She further opined that Plaintiff is permanently and totally disabled from any and all gainful employment due to his lack of education, age, and allowed industrial conditions. (R. at 580.)

Plaintiff underwent an employability assessment performed for the BWC on June 17, 2008. (R. at 514.) Plaintiff's reading index showed weakness related to sentence and paragraph comprehension. Plaintiff was unable to complete basic math computations involving multiplication, divisions, and fractions. The examiner assessed that Plaintiff's educational aptitudes are decreased and not compatible with formal re-training in semi-skilled to skilled areas. Results from the Minnesota Clerical Test show that Plaintiff's score fell in the very low range, indicating a decreased capacity to attend to tabular details. The examiner opined that Plaintiff could expect to struggle significantly in occupations where perceiving details and tabular material, observing differences in copies, or proofreading words and numbers would be required of him. The examiner concluded as follows:

> A review of the evaluation data obtained indicates that Plaintiff is demonstrating insufficient worker traits to qualify for gainful employment. At best, he is limited to sedentary activities. At this level, he presents with neither marketable nor transferable skills given his past relevant work history and current physical and psychological limitations. Compounding rehabilitation difficulties are his decreased educational aptitudes as it related to reading and math. In addition, he continues to display decreased concentration and focus, not consistent with competitive employment standards.

(R. at 516.)

On January 10, 2008, Dr. Mancuso reported that Plaintiff's depressive condition is worsening because he "is no longer collecting any compensation." (R. at 579.) She indicated

9

that Plaintiff's back pain was chronic and consistent and that he would not be able to sustain gainful employment. (*Id*.) She also noted that his medications caused excessive sedation which would impair concentration, persistence, and pace, but without the medication, he would not sleep which would impair his energy and cognitive functioning. (*Id*.) She opined that Plaintiff's fluctuating mood would cause difficulty with supervisors, co- workers, and the public. (R. at 579.) On April 1, 2008, Dr. Mancuso, reported that Plaintiff wakes in pain with no motivation or energy to do anything. (R. a 578.) She also reported that Plaintiff's sleep is disturbed, he has increased appetite, he is napping, and he has a lack of interest. (*Id*.) Dr. Mancuso referred Plaintiff to a Sleep Disorder Clinic. (*Id*.)

Dr. Altic opined on February 28, 2008, that based on Plaintiff's "chronic daily pain," his "ambulatory problems," the "[workers' compensation] allowances of disc displacement," and Plaintiff's "overall functional impairment," Plaintiff was "permanent[ly] and totally disabled from all gainful means of employment." (R. at 488.)

On April 25, 2008, Robert Turner, M.D., an orthopedist, examined Plaintiff on behalf of the Industrial Commission to determine whether he retained the residual physical capacity to engage in sustained remunerative employment. Dr. Turner opined that Plaintiff has reached maximum medical improvement with respect to his sprained right elbow/forearm; sprained right ankle; muscle spasms in his lower back; disc herniation L5-S1 on his left side; radiculopathy lumbosacral; acute strain rectus abdominous muscle right; and his left groin sprain of pelvis. Dr. Turner noted that his percentage of permanent partial impairment is 23%. Dr. Turner concluded that Plaintiff could do sedentary work. (R. at 526-30.)

Psychiatrist Donald Brown, M.D. examined Plaintiff on April 25, 2008 on behalf of the Industrial Commission to determine whether he retained the residual psychological capacity to engage in sustained remunerative employment. Dr. Brown reported that Plaintiff had reached maximum medical improvement with respect to his previously allowed psychological condition and that he has a 25% impairment. Dr. Brown opined that Plaintiff's depression was "fairly well stabilized" and should not prevent him from returning to work. He further opined that Plaintiff's depression would cause mild impairment in socialization and maintaining concentration, persistence and pace, as well as moderate impairment in adaptation, but that it did cause work limitations. (R. at 520-25.)

Based on the above reports from Drs. Brown and Turner, the Industrial Commission of Ohio rejected Plaintiff's application for permanent total disability compensation, finding that he could do unskilled sedentary work. (R. at 509-10.)

On February 9, 2009, Dr. Mancuso explained that she had not seen Plaintiff in person since June 2008. Dr. Mancuso reported that Plaintiff's depression and attitude had declined since the last visit. Plaintiff reported a lack of energy, enthusiasm, interest, and a significant sleep disturbance. Dr. Mancuso opined that Plaintiff's condition had deteriorated. (R. at 577.) Plaintiff saw Dr. Mancuso a few times from February to June 2009. (R. at 460-62, 469.) Plaintiff reported that he went to Las Vegas in May-June 2009. (R. at 460.)

In June 2009, Dr. Mancuso completed a Mental Impairment questionnaire. (R. at 455-59.) Dr. Mancuso reported that Plaintiff had moderate-to-marked limitations in his activities of daily living and his social functioning, as well as moderate limitations in his ability to maintain concentration, persistence or pace. Dr. Mancuso also reported that Plaintiff had undergone one

11

or two episodes of extended decompensation. (R. at 457.) She noted that Plaintiff was still "significantly depressed" despite improvement in mood and socialization, and assigned him a GAF score of 55. (R. at 455.) She opined that, on average, Plaintiff would miss more than four days of work per month due to his condition, which she diagnosed as both depressive disorder, not otherwise specified, and major depressive disorder, single episode. (R. at 458.)

## IV. THE ADMINISTRATIVE DECISION

On January 15, 2010, the ALJ issued his decision. (R. at 8-19.) The ALJ found that Plaintiff had the following severe combination of impairments: obesity; degenerative disc disease of the lumbar spine with history of surgery in 1993; right elbow and arm sprain; depression; history of pleurisy; and left leg pain. (R. at 10.) He further found that, through the date last insured, Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments. (R. at 12.) The ALJ set forth Plaintiff's residual functional capacity ("RFC") as follows:

> [Plaintiff] had the residual functional capacity to perform a reduced range of light work (20 CFR 404.1567(b)). Specifically, [Plaintiff] was able to lift/carry/push/pull ten pounds occasionally and sit/stand/walk for six hours each in an eight-hour day. [Plaintiff] was able to occasionally climb ramps and stairs and was precluded from climbing ramps and scaffolds. He was able to stoop occasionally. In addition, [Plaintiff] retained the ability to understand, remember and carry out simple tasks and instructions, maintain concentration and attention for two hour segments over an eight-hour work period. He also was able to respond to supervisors and co-workers in a task oriented setting where contact with others was casual and infrequent.

(R. at 14.) Relying on the VE's testimony, the ALJ concluded that Plaintiff was able to perform his past relevant work as a paint inspector, as he performed it. (R. at 18.) This work did not require the performance of work-related activities precluded by Plaintiff's RFC. (*Id.*) He therefore concluded that Plaintiff was not disabled. (*Id.*)

12

## V. STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial

right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI. ANALYSIS

Plaintiff advances three arguments in support of his assertion that the Court should reverse the Commissioner's decision. First, Plaintiff contends that the ALJ erred in failing to accord controlling weight to his treating physicians' opinions. Second, Plaintiff asserts that the ALJ erroneously substituted in his own non-medical opinions rather than adopting his treating physicians' opinions. Finally, Plaintiff submits that the ALJ erred in his assessment of Plaintiff's credibility. For the reasons that follow, the undersigned finds that the ALJ's failure to properly evaluate Dr. Mancuso's opinions constitute reversible error.[3]

The ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case. 20 C.F.R. § 416.927(d). The applicable regulations define medical opinions as "statements from physicians . . . that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 416.927(a)(2).

The ALJ generally gives deference to the opinions of a treating source "since these are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone . . . ." 20 C.F.R. § 416.927(d)(2); *Blakley*, 581 F.3d at 408. If the treating physician's opinion is "well-supported

---

[3]This finding obviates the need for in-depth analysis of Plaintiff's remaining assignments of error. Thus, the undersigned need not, and does not, resolve the alternative bases Plaintiff asserts support reversal and remand.

by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling weight." 20 C.F.R. § 404.1527(d)(2).

If the ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must meet certain procedural requirements. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). Specifically, if an ALJ does not give a treating source's opinion controlling weight:

> [A]n ALJ must apply certain factors—namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source—in determining what weight to give the opinion.

*Id.*

Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] your treating source's opinion." 20 C.F.R. § 416.927(d)(2). Accordingly, the ALJ's reasoning "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Friend v. Comm'r of Soc. Sec.*, No. 09-3889, 2010 WL 1725066, at *7 (6th Cir. 2010) (internal quotation omitted). The United States Court of Appeals for the Sixth Circuit has stressed the importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule. *See Halloran v. Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004).

15

*Wilson*, 378 F.3d at 544–45. Thus, the reason-giving requirement is "particularly important when the treating physician has diagnosed the claimant as disabled." *Germany-Johnson v. Comm'r of Soc. Sec.*, 312 F. A'ppx 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242).

Finally, the Commissioner reserves the power to decide certain issues, such as a claimant's residual functional capacity. 20 C.F.R. § 404.1527(e). Although the ALJ will consider opinions of treating physicians "on the nature and severity of your impairment(s)," opinions on issues reserved to the Commissioner are generally not entitled to special significance. 20 C.F.R. § 404.1527(e); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).

Dr. Mancuso, Plaintiff's psychologist, is a treating source. It is clear that the ALJ considered some of the opinions that Dr. Mancuso rendered. With regard to Dr. Mancuso's other opinions, however, the ALJ's decision is unclear whether he considered and rejected them or whether he merely overlooked them. Specifically, the ALJ considered and addressed Dr. Mancuso's November 2007 opinion that Plaintiff was "permanently and totally disabled from any and all gainful employment due to his lack of education, age, and allowed industrial conditions," and also her opinion that Plaintiff had a low tolerance for stress. (R. at 580, 16.) He rejected the foregoing opinions, in part, because Dr. Mancuso "*did not provide any specific mental limitations* and as noted above, a finding of disability is a determination reserved for the Commissioner." (R. at 16 (emphasis added).)

The ALJ's assertion that Dr. Mancuso did not provide any specific mental limitations suggests that he did not review or consider the opinions she rendered in June 2009 via the Mental Impairment Questionnaire she completed. Within the Questionnaire, Dr. Mancuso opined that Plaintiff had moderate-to-marked limitations in his activities of daily living and his

16

social functioning, as well as moderate limitations in his ability to maintain concentration, persistence or pace. She also indicated that Plaintiff had difficulty thinking or concentrating and that he suffered memory impairment. (R. at 456.) Significantly, she opined that on average, Plaintiff's mental impairments or treatment for his mental impairments would cause Plaintiff to miss more than four days of work. (R. at 458.) Thus, contrary to the ALJ's assertion, Dr. Mancuso did offer her opinions on Plaintiff's mental limitations. The ALJ's failure to even mention Dr. Mancuso's June 2009 Questionnaire or the opinions she offered therein further supports the conclusion that he neglected to consider Dr. Mancuso's June 2009 opinions. *See Bowen,* 478 F.3d at 749 ("[T]here is not even a passing reference to [the treating physician's] opinion in the ALJ's decision that allows us to infer that the ALJ intended to indirectly attack it."). For example, in concluding that Plaintiff "had experienced no episodes of decompensation . . . of extended duration," the ALJ makes no mention of Dr. Mancuso's inconsistent representation on the June 2009 Questionnaire that Plaintiff had experienced "[o]ne or [t]wo" such episodes. (R. at 13, 457.)

The undersigned concludes that the ALJ committed reversible error. As set forth above, an ALJ is obligated to consider all medical opinions that he or she receives in evaluating a claimant's case. 20 C.F.R. § 416.927(d). To the extent the ALJ considered but rejected Dr. Mancuso's opinions, the ALJ was obligated to justify why he rejected those opinions and reached inconsistent conclusions because of Dr. Mancuso's status as Plaintiff's treating source. *See Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009) (quoting *Wilson*, 378 F.3d at 545 (internal quotations omitted)) ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and we will

continue remanding when we encounter opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion."). The limitations Dr. Mancuso set forth clearly have an effect on the merits of the case. For example, she opined that Plaintiff's mental impairments would cause him, on average, to miss more than four days of work per month, a limitation the VE testified would be "problematic." (R. at 41-42.) The ALJ's RFC reflects limitations generally less restrictive than the limitations Dr. Mancuso assigned to Plaintiff. Thus, even though the ALJ may ultimately reject Dr. Mancuso's June 2009 opinions and provide good reasons for doing so, remand is appropriate so that the ALJ can address the inconsistencies.

## VII.  CONCLUSION

Due to the errors outlined above, the undersigned **RECOMMENDS** that the Court **REVERSE** the Commissioner of Social Security's non-disability finding and **REMAND** this case to the Commissioner and the ALJ under Sentence Four of § 405(g) for further consideration consistent with this Report and Recommendation.

## VIII.  PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and

Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation). Even when timely objections are filed, appellate review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).


Date: February 22, 2012      /s/ *Elizabeth A. Preston Deavers*
    Elizabeth A. Preston Deavers
    United States Magistrate Judge